**UNITED STATES, Appellee,**

v.

**Private (E-1) Clifford B. HUBBARD, SSN 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, United States Army, Appellant.**

**CM 443159.**

U.S. Army Court of Military Review.

13 July 1984.

## OPINION OF THE COURT

Before MOUNTS, YAWN and WERNER, Appellate Military Judges.

WERNER, Judge:

Contrary to his pleas, the appellant was convicted of committing unpremeditated murder; felony murder; attempted sodomy; and indecent, lewd, and lascivious acts with a child, in violation of Articles 118, 80, and 134, Uniform Code of Military Justice, 10 U.S.C. § 918, 880 and 934. His adjudged sentence of a dishonorable discharge, confinement at hard labor for life, and total forfeitures was approved by the convening authority.

The appellant contends, *inter alia,* that the military judge erred by admitting the Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832, testimony of Private Joseph H. Courtney, and that the evidence does not allow us to affirm the findings. We disagree.

### I. THE FACTS

#### A. The Homicide

The victim, Derek K., was a fourteen-year-old military dependent. During the early evening of 5 February 1982, Derek and his twin brother went to the bowling alley at Schofield Barracks, Hawaii. Three or four times that evening the twins and some friends stepped outside to smoke cigarettes and marijuana. At around 2000 hours, Derek, an asthmatic, complained to his friends that he was having trouble breathing. A half hour later he told his brother to meet him outside their home at 2100 hours and left the bowling alley. Derek did not meet his brother at the appointed time. At 2215 hours, a schoolmate of Derek's saw him enter the bowling alley, drink some water, and leave. Derek's friends and family did not see him alive again. About 1700 hours the next day, Specialist Four Thomas W. Spindle found Derek's bruised and semi-nude body at the bottom of a long flight of steps leading into

Mr. Jack B. Zimmerman, Esquire, argued the cause for the appellant. With him on the brief were Mr. Clinard J. Hanby, Esquire, Captain Warren G. Foote, JAGC, and Captain William T. Wilson, JAGC.

Captain Richard G. Mann, Jr., JAGC, argued the cause for the appellee. With him on the brief were Colonel James Kucera, JAGC, Lieutenant Colonel John T. Edwards, JAGC, and Captain Thomas E. Booth, JAGC.

an abandoned bomb shelter on Schofield Barracks. Spindle said he checked for a pulse, but did not otherwise disturb the body. He reported his find to other servicemembers who in turn notified the police. According to the medical examiner, Derek probably died of asphyxiation after a hand or foreign object had been applied to his mouth and nose. The examiner did not, however, completely rule out asthma as the cause of death.

## B. PFC Courtney

Although the authorities had no immediate suspects, attention soon focused on Spindle. Spindle had said that Derek was wearing white athletic socks with colored stripes when he discovered him; when the police collected the body, however, the socks were rolled down to the ankles, preventing anyone from seeing the stripes. When asked who could provide an alibi for him, Spindle named the appellant, PFC Courtney and Private Duane Reynolds. At the trial, Reynolds testified he had seen and chatted briefly with Spindle several times during the night and early morning of 5 and 6 February, respectively.

Upon questioning, Courtney gave numerous and different versions of what he and others had done on the night of Derek's death. At first, he completely denied being with Spindle on the night of the murder. Later, he admitted going to the vicinity of the bomb shelter with both Spindle and the appellant and said he saw them enter the bunker. He said that a dark figure went inside and that he soon heard screams of "someone in [their] puberty years." Later still, he amended the story by saying he had left Spindle and the appellant when he suspected the two were planning to engage in homosexual activity and claimed to have witnessed a "short shadow" romping with Spindle and the appellant on the grass close to the shelter. He then saw the three of them enter the bunker and from a position near the entrance of the shelter witnessed the "shadow" being severely beaten. He said he ran back to the barracks when one of the assailants realized they were being watched.

By the time of the Article 32 investigation, Courtney had changed his story again, admitting he had met young Derek in front of the Enlisted Man's Club as he walked with Spindle and the appellant to the bomb shelter. He claimed the boy accompanied them to an area near the shelter to get "high." After the four of them shared a marijuana cigarette, the appellant and Spindle began "horsing around" on the grass with the young boy while Courtney sat by a tree, keeping to himself. Courtney had previously given a similar version of this story in which he said Derek was an unwilling participant in the activities. At the Article 32 hearing, he said Derek appeared to have consented. At some point, however, it is clear the "play" turned serious. In both versions, Courtney claimed the appellant instructed Spindle to pull the boy's pants down while he pinned him to the ground. The boy was then flipped over to face down. Spindle went around to hold Derek's shoulders, while the appellant attempted to perform "rectal" intercourse on the young boy. At that time, according to Courtney, Derek "freaked out," or went into seizure-like convulsions, struggling and screaming. Soon after, he stopped moving completely. Courtney, who had been a passive observer, pushed Spindle and the appellant away from the child with "everything [he] had." He checked Derek's pulse and, finding none, told the appellant and Spindle the boy was dead. The three men then took Derek's dead body to the bunker. Courtney admitted he held a flashlight for the other two while they carried the body partway down the stairs, letting it roll the rest of the way. Courtney then ran back alone to his quarters and locked the door.

On 14 June, just two weeks before the appellant's trial, Courtney failed to report for duty. His company commander notified the military police, the Criminal Investigation Command, and the trial counsel's office, and ordered searches for him in establishments known to be frequented by servicemen absent without authority. Courtney was nowhere to be found. When

his company commander learned that a fellow servicemember had driven Courtney and a companion, PFC Hanson, to the airport, he had the airlines contacted in an attempt to learn the fugitives' destination. This effort also met with negative results.

Courtney was still missing two days before the appellant's trial and it was then that the company commander contacted Courtney's parents at their home in Ohio. They did not know his whereabouts, but did know that Courtney had recently received a speeding ticket in Ventura, California, and had called them requesting that money be wired to him in Ridgecrest, California. This information was teletyped to federal and local authorities in that state. Police in his hometown were also notified that Courtney was wanted to testify at the appellant's court-martial in Hawaii. Despite these efforts, Courtney was still missing on 30 June when appellant's trial began. The military judge found Courtney "unavailable" to testify at trial and his Article 32 testimony was admitted into evidence pursuant to Military Rule of Evidence 804(b)(1).

## II.  THE ADMISSIBILITY OF PFC COURTNEY'S ARTICLE 32 TESTIMONY

Military Rule of Evidence 804(b)(1) states that the following is not excluded by the hearsay rule if the declarant is unavailable as a witness:

> Testimony given as a witness at another hearing of the same or different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. A record of testimony given before courts-martial, courts of inquiry, military commissions, other military tribunals, and before proceedings pursuant to or equivalent to those required by Article 32 is admissible under this subdivision if such record is a verbatim record.

The appellant contends PFC Courtney's Article 32 testimony is inadmissible because Courtney was not unavailable; an Article 32 investigation is not a prior judicial proceeding; and he did not have a motive to develop Courtney's testimony at the Article 32 investigation similar to the one he would have had at the trial.

### A.  Unavailability

■ Military Rule of Evidence 804(a)(5) provides that a declarant is unavailable if he "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance ... by process or other reasonable means...." A determination of unavailability is contingent upon the prosecutorial authorities' good-faith effort to obtain the declarant's presence at trial. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). "Good-faith" is measured in terms of "reasonableness." *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980). *Accord Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

*Ohio v. Roberts, supra,* is dispositive of this issue. Roberts was charged with forging a check in the name of Bernard Isaacs and possessing stolen credit cards belonging to Isaacs and his wife. At a preliminary hearing in January 1975, the defense called Isaacs' daughter, Anita, and unsuccessfully attempted to get her to admit that she had given Roberts the check and credit cards. Shortly thereafter, Anita left Ohio. Between November 1975 and March 1976, five subpoenas were issued to Anita at her parents' residence; she did not receive any of them. The only other effort the State made to locate Anita was a telephone call to her parents four months before trial, which revealed little more than the fact that they did not know where she was. In March 1976, Roberts was tried

and, since Anita was not present to testify, the prosecutor offered a transcript of her testimony at the preliminary hearing into evidence. Anita was determined to be "unavailable," and the prior testimony was admitted. The Court held that "[g]iven these facts, the prosecution did not breach its duty of good-faith effort." *Id.* at 75, 100 S.Ct. at 2544.

■ The Government's efforts to find Courtney exceed those made by the prosecution in *Roberts.* Although these endeavors were unsuccessful, that fact does not render them deficient. One may always think of the unexplored alternatives, but hindsight is not the proper standard by which to measure reasonableness of effort. *Id.* at 75, 100 S.Ct. at 2544; *United States v. Thornton,* 16 M.J. 1011, 1013 (ACMR 1983). What the Supreme Court said about the sufficiency of the prosecution's efforts in *Roberts* is equally applicable here: "[T]he great improbability that [additional] efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Ohio v. Roberts,* 448 U.S. at 76, 100 S.Ct. at 2544. Courtney was a fugitive from justice, and nothing indicated he would soon turn himself in or be captured. *See United States v. Douglas,* 1 M.J. 354, 355 (C.M.A.1976); *United States v. Obligacion,* 17 U.S.C.M.A. 36, 37 C.M.R. 300 (1967) (unauthorized absence of declarant established requisite unavailability). Accordingly, we find, as did the military judge, that the Government made a good-faith and reasonable effort to secure the presence of Courtney at the trial, and their failure to find him rendered him an unavailable witness within the meaning of Military Rule of Evidence 804(a)(5). *See also United States v. Wheeler,* 21 U.S.C.M.A. 468, 45 C.M.R. 242 (1972); *United States v. Burrow,* 16 U.S.C.M.A. 94, 36 C.M.R. 250 (1966); *United States v. Thornton, supra; United States v. Kelly,* 15 M.J. 1024 (A.C. M.R.1983); *United States v. Chambers,* 47 C.M.R. 549 (A.F.C.M.R.1973); *United States v. Downs,* 46 C.M.R. 1227 (N.C.M.R. 1973).

### B. Article 32 Hearing as a "Judicial Proceeding"

■ The appellant's assertion that the Article 32 hearing is not a judicial proceeding within the meaning of Military Rule of Evidence 804(b)(1) is without merit. First of all, the rule itself expressly provides for the admission of testimony taken at an Article 32 investigation if it is recorded verbatim. Secondly, precedent long ago established that an Article 32 hearing is "judicial in nature" and its appointed investigating officer is a judicial or quasi-judicial officer. *See, e.g., United States v. Samuels,* 10 U.S.C.M.A. 206, 212, 27 C.M.R. 280, 286 (1959); *United States v. Nichols,* 8 U.S.C.M.A. 119, 124, 23 C.M.R. 343, 348 (1957); *United States v. Grimm,* 6 M.J. 890 (A.C.M.R.), *pet. denied,* 7 M.J. 135 (C.M.A.1979). Lastly, we note that at the hearing Courtney was under oath; the appellant was represented by counsel; and the proceedings were recorded verbatim. *See also Ohio v. Roberts,* 448 U.S. at 72–73, 100 S.Ct. at 2542–2543; *California v. Green, supra.*

### C. Similar Motive to Develop Courtney's Testimony

■ The record belies the appellant's contention that his "motive for cross-examination of Courtney [at the Article 32 hearing] was not for purposes of cross-examination at trial but to merely discover what his testimony was going to be." The motive of an opponent to the admission of former testimony may be determined by an objective examination of his conduct in light of the circumstances at the time of the former testimony. *See generally* S. Saltzburg, L. Schinasi & D. Schlueter, *Military Rules of Evidence Manual* 376–77 (1981); *see also United States v. Pizarro,* 717 F.2d 336 (7th Cir.1983). At the trial, the appellant would have attempted to discredit Courtney by

confronting him with his prior inconsistent statements, use of drugs, and personal involvement in Derek's death. At the Article 32 hearing, the trial defense counsel conducted a thorough, lengthy and vigorous cross-examination of Courtney which highlighted all these areas. Most noteworthy are the more than forty questions which were directed to Courtney regarding his prior inconsistent statements. Accordingly, we are convinced that counsel's questioning of Courtney

> comported with the principal purpose of cross-examination: to challenge "whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed." Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1378 (1972).

*Ohio v. Roberts,* 448 U.S. at 71, 100 S.Ct. at 2541. *See also United States v. Kelly,* 15 M.J. at 1028 ("[t]he principal guarantee of reliability in cases of prior testimony is that the witness has been cross-examined for a similar purpose"). We hold that Courtney's testimony at the Article 32 hearing was properly admitted at appellant's trial.[1]

### III. SUFFICIENCY OF THE EVIDENCE

The appellant contends that his convictions cannot stand because they are based almost solely on the uncorroborated testimony of Courtney, a self-confessed accomplice.[2] The military rule on this matter is well established: Accomplice testimony must be corroborated only if the testimony is self-contradictory, uncertain, or improbable. Paragraph 74a (2), Manual for Courts-Martial, United States, 1969 (Revised edition) (Change 3, effective date 1 September 1980); *United States v. Rehberg,* 15 M.J. 691 (A.F.C.M.R.), *pet. denied,* 16 M.J. 185 (C.M.A.1983); *United States v. McPherson,* 12 M.J. 789 (A.C.M.R.), *pet. denied,* 13 M.J. 243 (C.M.A.1982). We find Courtney's testimony certain and consistent. Nothing in it strains logic or contradicts the physical evidence. While Courtney had made a number of prior statements inconsistent with his Article 32 testimony, "the self-contradictory factor relates solely to the testi-

---

1. We note with approval that the federal appellate courts have very broadly interpreted Federal Rule of Evidence 804(b)(1), the counterpart of Military Rule of Evidence 804(b)(1). A "similar motive" to develop testimony has been found in a variety of seemingly dissimilar situations. *See, e.g., United States v. Licavoli,* 725 F.2d 1040, 1048 (6th Cir.1984) (motive on cross-examination of witness at federal trial for violation of Racketeer Influenced and Corrupt Organizations Act would have been "substantially identical" to motive appellant had on cross of same witness at a state murder trial), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984) (No. 83–1657); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 299 (3rd Cir.1983) (court in dicta said that testimony of seventeen witnesses who had testified before Japanese Fair Trade Commission twenty years earlier was admissible in federal antitrust trial against all parties to the Japanese proceeding since motive of defendants when cross-examining those witnesses before the Commission was the same as it would have been at the trial). "Opportunity" to develop the testimony also has been defined liberally, even when the actual

questioning has been minimal. *See, e.g., United States v. King,* 713 F.2d 627, 630 (11th Cir.1983) (court found appellant had opportunity to cross-examine witness at a prior proceeding despite trial judge's limitations on scope and breadth of examination; opportunity to cross-examine must be adequate or meaningful but not unbounded), *cert. denied sub nom., McGlockin v. United States,* —— U.S. ——, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984); *United States v. Pizarro, supra,* (lack of cross-examination at prior proceeding did not render testimony inadmissible; it is not the extent of the cross-examination that matters, but "whether the party's handling of the testimony was meaningful in light of the circumstances which prevailed when the former testimony was offered"). *See also United States v. Monaco,* 702 F.2d 860 (11th Cir.1983); *DeLuryea v. Winthrop Laboratories,* 697 F.2d 222 (8th Cir.1983). *See generally* J. Weinstein & M. Berger, *Weinstein's Evidence* paragraph 804(b)(1)[01] through [05] (1981).

2. While we are not convinced Courtney was an accomplice to Derek's murder, we will assume he was for the purpose of resolving this issue.

mony of the witness during the trial." *United States v. McPherson,* 12 M.J. at 791, and cases cited therein. As Courtney's testimony was internally consistent, there is no requirement for corroboration. Of course, we have considered Courtney's drug use, involvement in Derek's death, and prior inconsistent statements—and his explanation for them: friendship and fear—in assessing the weight we should accord his testimony. We are satisfied beyond a reasonable doubt that the evidence is sufficient to support the convictions.

The remaining assignments of error are without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge MOUNTS and Judge YAWN concur.